CITY OF DETROIT v GORNO STEEL & PROCESSING COMPANY

Docket Nos. 80286, 80712. Submitted June 24, 1986, at Detroit. Decided January 21, 1987. Leave to appeal applied for.

The City of Detroit commenced condemnation proceedings in the Wayne Circuit Court for the condemnation of parcels of land and the buildings thereon as part of the Poletown Project. The city and the defendants, Gorno Steel & Processing Company and Quality Steel Pickling & Processing, Inc., originally agreed to a consent judgment providing for arbitration. That judgment was subsequently set aside by the trial court, David C. Vokes, J., and the case proceeded to trial. A jury returned a verdict of $4,352,050 for the defendants and a judgment was entered in accordance therewith. Defendants' subsequent motions for a new trial, judgment notwithstanding the verdict or additur were denied. Defendants appeal from the judgment on the jury verdict and from the denial of their post-trial motions. The appeals were consolidated by the Court of Appeals.

The Court of Appeals *held:*

1. The request to set aside the consent judgment was properly granted. The Court of Appeals disagreed with the trial court's determination that the consent judgment should be set aside on the ground of mutual mistake. The Court of Appeals would rely instead on the court rule granting relief for "any other reason justifying relief from the operation of the judgment" and grant relief based on the existence of "extraordinary circumstances."

2. The trial court did not abuse its discretion in denying defendants' motion for a new trial. The jury verdict which

REFERENCES

Am Jur 2d, Appeal and Error §§ 880 *et seq.*

Am Jur 2d, Attorneys at Law §§ 154-158.

Am Jur 2d, Judgments §§ 708 *et seq.;* 823.

Am Jur 2d, New Trial §§ 137 *et seq.*

Power of court to vacate or modify order granting new trial in civil case. 61 ALR2d 642.

Authority of attorney to compromise action. 30 ALR2d 944.

See also the annotations in the Index to Annotations under Appeal and Error; Vacation and Modification of Judgment or Verdict.

awarded nothing for intangible assets was not a miscarriage of justice.

3. The trial court properly instructed the jury in regard to the placing of a value on the intangible assets and properly refused the instruction proposed by the defendants.

4. The trial court did not abuse its discretion in admitting evidence of the price paid by defendants for a portion of the property they purchased a little more than a year before defendants surrendered possession of their property. Furthermore, error requiring reversal did not occur in regard to the admission of evidence of an appraisal conducted in connection with the sale of that property.

5. Defendants failed to propose any valid basis for granting their request for a new trial based on the contention that they were denied a fair trial because the jury did not include business or professional people.

Affirmed.

1. JUDGMENTS — RELIEF FROM JUDGMENTS — COURT RULES.

Three requirements must be satisfied in order to obtain relief from a judgment under the subsection of the court rule regarding relief from judgments which states that relief may be granted for "any other reason justifying relief from the operation of the judgment": (1) subsections (1) through (5) of the rule must be found to be inapplicable; (2) the substantial rights of the opposing party must not be detrimentally affected by sitting aside the judgment; and (3) extraordinary circumstances must exist which mandate setting aside the judgment in order to achieve justice (GCR 1963, 528.3[6]).

2. JUDGMENTS — RELIEF FROM JUDGMENTS — ATTORNEY AND CLIENT.

The act of an attorney compromising his client's cause of action without the authority to do so constitutes extraordinary circumstances justifying relief from a judgment (GCR 1963, 528.3[6]).

3. ATTORNEY AND CLIENT — POWER TO COMPROMISE.

Generally, an attorney has no power, by virtue of his general retainer, to compromise his client's cause of action; precedent special authority or subsequent ratification is necessary to make such a compromise valid and binding on the client.

4. ATTORNEY AND CLIENT — MUNICIPAL CORPORATIONS — CITY ATTORNEYS.

A city attorney does not, as a matter of law, have the independent authority to enter into any type of consent judgment or

settlement without prior approval of the appropriate city authorities.

5. NEW TRIAL — VERDICT AGAINST GREAT WEIGHT OF EVIDENCE.

A verdict is against the great weight of the evidence, thereby justifying a new trial, only if a miscarriage of justice has occurred because a great majority of the evidence has been ignored.

6. EVIDENCE — EMINENT DOMAIN — SALE PRICE — APPEAL.

It must be established, in determining whether a sale price may be admissible as evidence of the value of property in a condemnation action, that the sale was voluntary, that it was not too remote in time, and must not otherwise be shown to be without probative value; a trial court's ruling on the admissibility of such evidence will not be reversed absent an abuse of discretion.

*James C. Cobb, Jr.,* for plaintiff.

*Mason, Steinhardt & Jacobs, P.C.* (by *Walter B. Mason, Jr.,* and *Frederick D. Steinhardt*), for defendants.

Before: M. J. KELLY, P.J., and J. H. GILLIS and J. R. ERNST,* JJ.

J. H. GILLIS, J. On November 24, 1980, plaintiff, City of Detroit, commenced condemnation proceedings against approximately 5.5 acres of land (now identified as Parcels 644 and 644FA) located at 6565 Mt. Elliott Avenue in Detroit as part of the Poletown Project. On July 20, 1984, after approximately five weeks of trial, a jury rendered a verdict of $4,352,050 for defendants, the owners of the land and buildings thereon. On July 31, 1984, defendants filed motions for a new trial, judgment notwithstanding the verdict and additur, which were denied on September 11, 1984. Defendants now appeal as of right from the judgment entered

---

* Circuit judge, sitting on the Court of Appeals by assignment.

on the jury verdict and the denial of their post-trial motions.

Defendants were a steel processing and pickling business incorporated in Michigan, with Joseph Gorno, Sr., being the sole shareholder and chief executive officer. Defendants employed over one hundred workers, and overall ran a rather successful operation, producing an annual income of approximately $950,000. The sizeable parcels of land involved in these proceedings contained a sixty-year-old building in generally good condition which contained nearly one hundred thousand square feet of working area.

Prior to 1970, defendant Gorno Steel & Processing Company was only involved in the processing of steel. Quality Steel Pickling & Processing, Inc., was located next to Gorno, but was owned by Chromalloy Corporation, a large metal fabrication and jet engine manufacturing operation. In 1970, Gorno purchased the Quality Steel operation from Chromalloy, but leased the land and building from Chromalloy for $75,000 per year. The lease contained an option for Gorno to purchase the property at any time for $1,100,000. While the rent increased to $100,000 per year in 1975, Gorno never exercised the option.

In mid-1980, Chromalloy contacted defendants to discuss the possibility of defendants' purchasing the Quality Steel real estate and building. Chromalloy commissioned Valtec Associates to do a "quick and dirty" appraisal of the property. After an analysis of the appraisal's $450,000 valuation and some negotiation, the property was sold to defendants for $500,000, plus fifty percent of all possible condemnation proceeds in excess of $550,000. This led to an eventual final price of $562,500, and the sale was completed on October 31, 1980. On that same day, plaintiff sent to defendants a

condemnation offer of $1,175,000 for their real estate and building.

In January, 1981, plaintiff provided defendants with an additional offer of $1,800,000 for all movable fixtures located on their property. After the Michigan Supreme Court at first enjoined the Poletown Project and then eventually upheld it in March, 1981, plaintiff sent a notice to vacate the premises by July 8, 1981. After a hearing was held on the matter, the date by which defendants were asked to vacate was moved back to January 15, 1982. Defendants closed down their operations on that date and temporarily moved across the street to the facilities of a competitor to complete their existing contractual obligations. In July, 1982, Joseph Gorno, Sr., died, and by September, 1982, defendants had ceased doing any business in this state.

Before trial on the instant action was begun, the parties stipulated to the necessity of the condemnation of the property in question. In one of many pretrial motions, defendants asked that all reference to the Valtec appraisal be excluded from trial, on grounds that the appraiser was not available for cross-examination and that the appraisal was generally unreliable. The trial court granted the motion, but with the caveat that further discussion of the matter would be allowed outside the jury's presence if warranted by the development of the facts at trial. Defendants also requested that all evidence of the Chromalloy sale in 1980 be excluded, but the motion was denied since the trial court found the sale to be an arms-length transaction.

The focus of the dispute between the parties is the difference in their evaluation of the total value of the assets affected by the condemnation. During opening arguments, defendants proposed a figure

of approximately $8,500,000, while plaintiff argued that the total value of the assets was just over $3,000,000.

In support of their position, defendants offered the testimony of Joseph Makowski, a plant manager at Interstate Metal Pickling of Toledo, Ohio, and former plant supervisor for defendants. Mr. Makowski testified that the property condemned by plaintiff was uniquely suited for steel processing and pickling, and had many advantages which would be nearly impossible to duplicate. Among these was its nearly five acres of storage space, its proximity to the majority of defendants' customers and to the freeway and rail systems, and the building's high ceiling and excellent water supply, which made it ideal for steel pickling (a process which removes scaling and rusting from steel). Makowski concluded that finding a suitable replacement would be very difficult.

In an effort to disprove the plaintiff's contention that defendants had resumed operations in Ohio under the Interstate Metal Pickling name, defendants questioned Makowski extensively regarding the Interstate operations. Makowski stated that Joseph Gorno, Jr., was a high-level officer of the defendant corporation, and was currently the president of Interstate, but was not the owner. However, Makowski could not explain why Interstate was previously called J. A. Gorno, Jr. Steel Processing, Inc., and before that its Ohio articles of incorporation revealed its name as Gorno Steel Processing. Makowski also indicated that Interstate was much smaller than were the defendants, that it performed only pickling operations rather than processing and pickling, and that its five thousand tons of output per month was much less than the defendants' thirty-five thousand tons per month pickling operation. This was allegedly due

to the fact that the Interstate building held only eighteen thousand square feet of working area, housed only two cranes rather than the eight contained in the condemned building, and employed only fifteen workers. Makowski finally stated that although Interstate now possesses the equipment used by defendants to perform a unique pickling process for Ford Motor Company, and now performs that process for Ford, it had no past association with the defendants.

Defendants then presented the testimony of various experts whose appraisals had formed the basis for defendants' valuation of the property. William C. Banta testified that his appraisal of the fixtures included some 190 items inexplicably left out of the city's appraisal and which resulted in a $349,-095 difference in the fixture valuation. Forest B. Lindsey testified that his property appraisal was based on the assumption that a facility of equal function would have to be built, and such a site would now require 7.3 acres, rather than the 5.5 acres defendants had occupied, due to building ordinances which did not exist when defendants' building was constructed. Mr. Lindsey stated that if a cost estimate was made for adapting an existing building, the cost would be roughly the same.

James A. Koester, a CPA who handled defendants' accounting needs, testified that he valued defendants' intangible assets based on an approach discussed in a ruling of the Internal Revenue Service. Mr. Koester also noted that, in his opinion, the property and the defendants' business were inseparable, which explained why, despite an extensive search, the defendants could not find a suitable replacement property. Koester finally indicated that, to the best of his knowledge, Chromalloy's book value on the property sold to defendants in 1980 was $500,000 (implying that the

property was sold at a price which did not reflect the fair market value).

Defendants provided further testimony regarding the problems in attempting to relocate the business. One witness indicated that any relocation would involve a "laborious environmental licensing process" which could take as long as fifteen months. Another witness who had assisted in the unsuccessful search for replacement property stated his conclusion that the defendants' previous location was special purpose property which was inseparable from the business. Further, due to construction, zoning and environmental permit delays, any relocation would take a total of from twenty-four to twenty-seven months.

Defendants also sought to establish that the sale price of the Chromalloy property did not reflect its true value. A valuation consultant testified that, due to the long term association between Chromalloy and the defendants, the lack of any pre-sale analysis of the property by Chromalloy, and the fact that the purchase price was very close to Chromalloy's book value of the property, the sale price was of dubious relevance in determining its fair market value. On cross-examination, plaintiff asked the consultant whether he knew if any agents of Chromalloy evaluated the property before the sale was completed, prompting an objection and discussion out of the jury's presence. Defendants complained that the question violated the pretrial order excluding reference to the Valtec appraisal of the property. Plaintiffs responded that the question was necessitated by defendants' attempt to mischaracterize the Chromalloy sale to the jury, giving the impression that Chromalloy made no attempt to evaluate the property other than to look at the value placed in their books. The trial court ruled in plaintiff's favor, and when

the question was repeated for the witness, he indicated that he did not know if Chromalloy conducted an evaluation of the property before the sale. The same objection was raised to plaintiff's questioning of another witness, and when again overruled by the trial court, the witness indicated that he was unaware of any appraisal of the property performed by Chromalloy. Rather, the witness believed that the defendants and Chromalloy had a "gentleman's agreement" that the property would be sold at book value.

Plaintiff's case consisted of testimony from several appraisers who had provided it with the valuation figures it had relied upon. James Earl Harris, a fixture appraiser, stated that many of the items which defendants claimed he omitted from his appraisal were not included because they were either non-operational or not in place during the sixteen or seventeen times he had inspected the property. An independent real estate appraiser testified that his valuation of the property was lower than that of defendants because it was his opinion that other suitable properties existed in the metropolitan Detroit area, though he admitted that he did not make a personal inspection of defendants' property. Another real estate appraiser agreed, stating that from his inspection he would not consider the property to be "special purpose" property, but, instead, simply general industrial property. He also noted that the building obtained in the Chromalloy sale was rather old, with non-operational heating, and thus was worth only $500,000. Therefore, he did not believe that the book value of the property was relied upon to set the sale price.

After the jury was instructed by the trial court, the defendants made a motion for mistrial based upon the reference to the Valtec appraisal. The

motion was denied and, after five and one-half hours of deliberation, the jury returned a verdict for the defendants in the amount of $4,352,050, consisting of $1,000,000 for the real estate, $2,712,-050 for the fixtures, and $640,000 for the cranes. The jury awarded nothing for intangibles nor for any tangible assets other than the cranes and fixtures. Defendants appeal as of right from this award and the denial of their post-trial motions.

The first issue on appeal concerns a consent judgment providing for arbitration which had been accepted by the trial court, but later set aside on grounds of mutual mistake. The facts relevant to this issue are as follows. After an emergency motion to adjourn the trial date had been denied, Ronald Sogge, a private attorney who had been retained to represent plaintiff in the instant case, contacted Joseph Baltimore, Assistant Corporation Counsel for the city. Sogge informed Baltimore that he was not prepared to go to trial, and because he could obtain neither an adjournment nor an emergency appeal to this Court, he believed that the only alternative was to submit the case to arbitration. Baltimore did not believe he had the authority to authorize such action, to which Sogge responded: "Well, maybe I'm not calling you to say you have the authority. I'm just informing you that this is what I have to do to avoid [an] eight million dollar default judgment." Baltimore responded "Then do what you have to do," and ended the conversation.

Mr. Sogge then contacted the attorneys for defendants and a commitment to arbitration was prepared and signed. On January 3, 1984, the parties went before the trial court where Mr. Sogge informed the court that he had authorization to enter into arbitration. A consent judgment for arbitration was thus approved by the trial

court. Several days thereafter, the city, apparently reviewing the arrangement for the first time, rejected the consent judgment and ordered Sogge to file a motion to set aside the arbitration. Sogge resigned instead, and another attorney took over the case for plaintiff.

At an evidentiary hearing held to consider the matter, Emmett Moten, Jr., the Director of Community Economic Development (CEDD) for the city, testified that it was established policy, known to all attorneys working on behalf of plaintiff, that prior written approval was necessary before any consent judgment could be entered into on the city's behalf, and that only he had the authority to issue such approval. Sogge never discussed the matter with him, and he did not authorize any agreement to arbitrate. Further, he indicated that such authority would never have been given since it was against the mayor's policy to subject the city to arbitration.

Joseph Baltimore also testified that it was established policy that outside counsel had no authority to enter into any kind of settlement without prior approval from CEDD, and that this was made clear to Mr. Sogge not only in his contract of employment, but in several explicit memos sent to Sogge in August, 1981, and February, 1982. As with Mr. Moten, Baltimore testified that he was not made aware that a consent judgment had been entered into until after the fact. Further, he never gave Sogge approval to arbitrate with defendants since he did not have the authority to give such approval.

Ronald Sogge testified that he was not aware of any policy against arbitration on behalf of the city, and that since he had previously taken similar action without CEDD approval, he had assumed this time would be no different. Sogge was also of the

opinion that arbitration was the only alternative available to avoid a default judgment due to the lack of preparedness for trial. Finally, although he believed Baltimore had given him the authority to agree to arbitration in their phone conversation, whether he required such authority was never paramount in his mind.

As stated previously, the trial court granted the motion to set aside the consent judgment on grounds of mutual mistake, pursuant to GCR 1963, 528.3(1). While the court does have the power to vacate a judgment which has been procured by a mutual mistake of fact, *Gordon v City of Warren Planning & Urban Renewal Comm,* 388 Mich 82, 89; 199 NW2d 465 (1972), we do not believe this to be such a case since the alleged mistaken belief was held only by the plaintiff's attorney, and not the plaintiff itself. Instead, while we believe the request to set aside the consent judgment was properly granted, we would have relied upon GCR 1963, 528.3(6), which states that relief may be granted for "any other reason justifying relief from the operation of the judgment."

To obtain relief under rule 528.3(6), the following requirements must be satisfied. First, subsections (1) through (5) of the rule must be found to be inapplicable. Second, the substantial rights of the opposing party must not be detrimentally affected by setting aside the judgment. Finally, extraordinary circumstances must exist which mandate setting aside the judgment in order to achieve justice. *Coates v Drake,* 131 Mich App 687, 691; 346 NW2d 858 (1984); *Bye v Ferguson,* 138 Mich App 196, 202; 360 NW2d 175 (1984). As mentioned above, the first requirement is met since this is not truly an instance of mutual mistake, and none of the other enumerated grounds are applicable. Further, the second requirement is

met since, even though the consent judgment was set aside, defendants still received a full and fair trial, and no reasons have been advanced which would justify the conclusion that arbitration would protect any of the defendants' rights which a jury trial would not. Consequently, we are left only with the "extraordinary circumstances" requirement.

We believe it is safe to assume that the act of an attorney compromising his client's cause of action (such as entering into a consent judgment for arbitration on a three to eight million dollar lawsuit) without the authority to do so would constitute extraordinary circumstances justifying relief under rule 528.3(6). The question, then, is whether Ronald Sogge had such authority. The general rule in this regard "is that an attorney at law has no power, by virtue of his general retainer, to compromise his client's cause of action; but that precedent special authority or subsequent ratification is necessary to make such a compromise valid and binding on the client." *Coates, supra,* p 692, quoting *Henderson v Great Atlantic & Pacific Tea Co,* 374 Mich 142, 147; 132 NW2d 75 (1965). Since it is clear that there was no ratification of Mr. Sogge's actions by plaintiff, and in fact just the opposite occurred, the only question is whether there was some precedent special authority in Mr. Sogge to enter into a consent judgment to arbitrate on behalf of the plaintiff. We find that there was no such authority.

As a matter of law, a city attorney does not have the independent authority to enter into any type of consent judgment or settlement without prior approval of the appropriate city authorities. This fact was recognized in *Presnell v Wayne Co Bd of Co Road Comm'rs,* 105 Mich App 362, 367; 306 NW2d 516 (1981), where this Court relied upon the

following language from 17 McQuillin, Municipal Corporations (1967 rev vol), § 48.18, pp 124-126:

"To be legal and binding the compromise must be made by the duly authorized corporate officers. In municipal corporations proper, where the representative form of government prevails, and the corporators or inhabitants choose officers to represent and act for them in all matters which concern the interests of the corporation, the power of compromise usually exists in the mayor or the governing legislative body, generally denominated the common council. *Other officers are without authority to compromise, unless authorized by law.*

. . .

"*In counties and other civil subdivisions . . . the power of compromise usually exists in the representative boards, variously designated as courts, commissioners, supervisors and boards.*" [Emphasis added.]

The Court also quoted the following language from 56 Am Jur 2d, Municipal Corporations, Counties, and Other Political Subdivisions, § 812, p 811:

"A law officer of a municipal corporation has as a general rule no authority to compromise a claim or a pending action, in the absence of statutory authorization. Thus, it has been held that a county attorney, a corporation counsel of a city, or a city attorney, has no authority to compromise a claim without permission of the municipality." [105 Mich App 367-368.]

In the instant case, it is clear that Mr. Sogge should have gone to Emmett Moten for approval of the proposed consent judgment since, by all accounts, he was the official with the authority to subject the city to arbitration. The same applies to Baltimore, since he, too, had to go through CEDD for the authority to order arbitration. We conclude

that Mr. Sogge did not have authority to bind the plaintiff to arbitration, and that "extraordinary circumstances" existed to justify setting aside the consent judgment. While this is not the ground relied upon by the trial court, this Court will not reverse where the lower court reaches the correct result for the wrong reason. *Robertson v Detroit,* 131 Mich App 594, 596; 345 NW2d 695 (1983).

Defendants' next argument is that the trial court abused its discretion in denying their motion for a new trial, contending that the jury's failure to award any money for intangible assets was against the great weight of the evidence. A verdict is against the great weight of the evidence, thereby justifying a new trial, only if a miscarriage of justice has occurred because a great majority of the evidence has been ignored. *May v Parke, Davis & Co,* 142 Mich App 404, 410-411; 370 NW2d 371 (1985). In reviewing the decision to grant or deny such a motion, great deference should be given to the trial judge's superior position to assess the jury's verdict because he has heard the evidence first hand. *Drouillard v Metropolitan Life Ins Co,* 107 Mich App 608, 623; 310 NW2d 15 (1981).

In a condemnation case, such as this one, the intangible assets of a business amount essentially to its going concern value. The focus of the going concern question is the transferability of the business to another location, which must be determined on a case-by-case basis. *Detroit v Michael's Prescriptions,* 143 Mich App 808, 819; 373 NW2d 219 (1985). "If the business can be transferred, nothing is taken and compensation is therefore not required." *Id.*

Our review of the transcripts leads us to conclude that there is not nearly enough disparity in the evidence as to going concern value to charac-

terize the jury's verdict as a miscarriage of justice. We agree that defendants successfully demonstrated that their Detroit property, both in design and location, provided many advantages which would be missed, such as the excellent storage space and good water supply. They also established that a great effort to locate replacement property was unsuccessfully undertaken. However, their contention that the business and property were inseparable was seriously disputed by plaintiff's evidence. For example, defendants never adequately rebutted the inescapable inference from the plaintiff's evidence that defendants were operating under the Interstate Metal Pickling name in Ohio. The fact that Joseph Gorno, Jr., is the president of Interstate, and that Interstate was once called J. A. Gorno, Jr. Steel Processing, Inc., and Gorno Steel Processing, strongly calls into question defendants' position that their business operations were completely terminated as a result of the condemnation of their Detroit property. Also suspicious is the fact that Interstate now possesses the defendants' exclusive Reacto-Bond process, and performs that process for defendants' former client, Ford Motor Company. In light of this evidence, we cannot fault the jury for rejecting defendants' argument that the property and business were inseparable. Since defendants failed to establish that the jury verdict amounted to a miscarriage of justice, we cannot find an abuse of discretion on behalf of the trial court in denying defendants' motion for a new trial. *May v Parke, Davis & Co, supra,* pp 410-411.

Defendants next argue that the trial court erred when it instructed the jury, in accordance with SJI2d 90.23, that in placing a value on the intangible assets they must keep within the range of the testimony presented at trial, which placed a low

valuation of zero and a high of $1,521,500. Defendants now complain that the jury should not have been so limited, but, rather, should have been instructed in accordance with an Internal Revenue ruling which would assign a value to intangible assets on an inverse relationship basis to tangible assets.

We find no merit to the argument. Defendants take the position that the revenue ruling in question (Rev Rule 68-609, 1968-2 CB 327) was somehow binding as the only relevant method of valuation presented at trial. However, the simple fact is that this rather dubious method of valuation was not binding upon the trial court or jury, and we believe that it was properly rejected. The ruling itself applies only for taxation purposes and specifically states that the method proposed should be used sparingly and only when there is "no better basis available for making the determination of the fair market value of intangible assets." We cannot fathom why defendants should assume that the proposed method must be used in a condemnation case. Finally, we note that the effect of this instruction, as admitted by defendants before the trial court, would be to inform the jury that defendants are entitled to $8,500,000, the only question for their resolution being how to allocate this amount between tangible and intangible assets. Aside from its patent absurdity, such an instruction would have amounted to a directed verdict for the defendants and would have usurped the fact-finding role of the jury. The instruction was properly refused by the trial court. *Body Rustproofing, Inc v Michigan Bell Telephone Co,* 149 Mich App 385; 385 NW2d 797 (1986); *Detroit v Michael's Prescriptions, supra,* p 811.

Defendants next argue that the trial court erred in admitting evidence of the price paid by defen-

dants for the Chromalloy property. Defendants contend that the sale was made while both parties were aware of condemnation threats, and thus the sale price was an unreliable measure of the property's fair market value. Further, defendants claim that because they were tenants of Chromalloy at the time of the sale, the price was influenced by their landlord-tenant relationship, and thus did not amount to an arms-length transaction which would provide any indication of an open-market price. Thus, defendants claim that evidence of the sale price should not have been admitted.

In determining whether a sale price may be admissible as evidence of the value of property in a condemnation action, it must be established that the sale was voluntary and that it was not too remote in time, and must not otherwise be shown to be without probative value. *In re Petition of Dillman,* 263 Mich 542, 549-550; 248 NW 894 (1933); *State Highway Comm v Abood,* 83 Mich App 612, 618; 269 NW2d 247 (1978). A trial court's ruling on the admissibility of such evidence will not be reversed absent an abuse of discretion. *State Highway Comm v McGuire,* 29 Mich App 32, 34-35; 185 NW2d 187 (1970).

We cannot agree that the trial court abused its discretion in permitting the jury to hear the testimony regarding the sale. It is undisputed that Chromalloy voluntarily chose to dispose of the property at issue, and it is equally clear that the sale was not too remote in time, having taken place a little more than a year before defendants surrendered possession of their property. As to the question of probative value, while defendants did attempt to prove that this sale price basically represented Chromalloy's book value for the property rather than the fair market value, the facts

are that the sale involved negotiations over price and that an appraisal of the property was performed for Chromalloy prior to the sale. These facts support plaintiff's argument that the sale represented an arms-length transaction. Under these circumstances, the jury was properly afforded an opportunity to hear the evidence and decide for itself whether the sale price represented the fair market value of the property.

Next, defendant argues that the trial court erred by ignoring its own pretrial order excluding evidence of the Valtec appraisal conducted in connection with the Chromalloy property. There is no merit to this argument since the pretrial ruling did not totally foreclose any mention of the appraisal. Rather, the trial court specifically stated that further consideration would be given to the matter should such a discussion be warranted by the evidence presented at trial. It is precisely this caveat which the trial court relied upon in changing the prior ruling since it became clear as the trial progressed that the defendants were using the ruling to their unfair advantage. Specifically, defendants mischaracterized the facts by suggesting Chromalloy had absolutely no idea what the property in question was worth, when in fact they commissioned an outside firm to conduct an appraisal of the property.

Furthermore, we note that defendants do not state any reason why the evidence should have been excluded in the first place, nor do they cite authority for the proposition that a trial court may not reverse or modify its own rulings during the course of trial. The latter proposition is clearly unsupportable, and thus we must conclude that defendants have failed to establish any reversible error in regard to the admission of this evidence.

As their final argument on appeal, defendants contend that they were denied a fair trial because their case was heard by a jury which did not include business or professional people. Defendants cite no authority for the proposition that they are entitled to a jury which is representative of such specific vocations and they do not allege that the jury which did decide the case was incapable of rendering a fair verdict. Rather, defendants ask us to presume that government employees, teachers, housewives, secretaries and assembly workers, by nature of their occupations, are incapable of rendering a proper verdict in a case such as the instant one. We decline this invitation, and conclude that defendants have failed to propose any valid basis for granting their request for a new trial.

Affirmed.